**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Scott Drake Clabourne, | )  No. CV 03-542-TUC-RCC |
| Petitioner, | )  <u>DEATH PENALTY CASE</u> |
| v. | )  **MEMORANDUM OF DECISION** |
| Charles L. Ryan, et al.,[1] | )  **AND ORDER** |
| Respondents. | ) |

Petitioner Scott Drake Clabourne has filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. (Dkts. 25, 27.)[2] For the reasons set forth herein, the Court determines that Petitioner is not entitled to habeas relief.

## PROCEDURAL HISTORY

In September 1980, the body of Laura Webster, a twenty-two-year-old University of Arizona student, was found lying in the dry bed of the Santa Cruz River in Tucson. Approximately one year later, a woman named Shirley Martin reported to police that her former boyfriend, Scott Clabourne, had claimed involvement in a murder. Petitioner was already in custody on an unrelated burglary charge and, after questioning by detectives, gave

---

[1]     Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is substituted for his predecessor pursuant to Fed. R. Civ. P. 25(d)(1).

[2]     "Dkt." refers to the documents in this Court's file.

a detailed confession to Webster's rape and murder.

Petitioner was convicted by a jury in 1982 of sexual assault, kidnapping, and first degree murder. Pima County Superior Court Judge Richard Roylston sentenced him to death for the murder and to concurrent terms of imprisonment for the other counts. On direct appeal, the Arizona Supreme Court affirmed. *State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54 (1984) (*Clabourne I*). Proceedings on Petitioner's requests for state postconviction relief concluded in September 1990, and Petitioner thereafter sought habeas corpus relief in federal court.

In September 1993, United States District Court Judge Richard M. Bilby held an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel. The court concluded that counsel's representation at trial was not deficient, but that counsel was ineffective at sentencing. On appeal, the Ninth Circuit affirmed, and Petitioner returned to state court for resentencing. *Clabourne v. Lewis*, 64 F.3d 1373, 1387 (9th Cir. 1995).

After numerous Pima County superior court judges recused themselves, Petitioner's resentencing was assigned to Santa Cruz County Superior Court Judge Roberto Montiel. In August 1997, the court determined that Petitioner's proffered mitigating evidence was insufficient to call for leniency and resentenced Petitioner to death for the murder and to aggravated consecutive sentences of fourteen years imprisonment on the kidnapping and sexual assault counts.[3]

Petitioner appealed to the Arizona Supreme Court, which affirmed the capital sentence but modified the non-capital sentences to run concurrently. *State v. Clabourne*, 194 Ariz.

---

[3]     Arizona law at the time of Petitioner's 1997 resentencing required the presiding judge to decide whether to impose the death penalty. *See* A.R.S. § 13-703(B) (1990). Although the United States Supreme Court in *Ring v. Arizona*, 536 U.S. 584 (2002), later struck down as unconstitutional Arizona's requirement that aggravating factors be found by a judge rather than a jury, that ruling does not apply retroactively to cases like Petitioner's that were already final on direct review at the time *Ring* was decided. *Schriro v. Summerlin,* 542 U.S. 348, 358 (2004).

379, 390, 983 P.2d 748, 759 (1999) (*Clabourne II*), *cert. denied*, 529 U.S. 1028 (2000). He then sought state postconviction relief, which was denied in 2003. Thereafter, Petitioner initiated the instant federal habeas corpus proceeding.

## PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT

A writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim. *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and postconviction relief (PCR) proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was

omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753. Objective factors which constitute cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" is actual harm resulting from the alleged

constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

There are two types of claims recognized under the fundamental miscarriage of justice exception to procedural default: (1) that a petitioner is "innocent of the death sentence," – in other words, that the death sentence was erroneously imposed; and (2) that a petitioner is innocent of the capital crime. In the first instance, the petitioner must show by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the existence of any aggravating circumstance or some other condition of eligibility for the death sentence under the applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 336, 345 (1992). In the second instance, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

## STANDARD FOR HABEAS RELIEF

Because this case was filed after April 24, 1996, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The

relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Carey v. Musladin*, 549 U.S. 70 (2006); *Williams*, 529 U.S. at 365; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254 (d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddux*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

## FACTUAL BACKGROUND

*The Offense and Trial*

In his confession, Petitioner described how he and two friends, Larry Langston and Edward Carrico, went to the Green Dolphin bar in Tucson on September 18, 1980, to "find some women." (Dkt. 27, Ex. 2 at 1.) There, they met Laura Webster and convinced her to leave with them, telling her they were going to a "cocaine party." (*Id.* at 2.) After driving some distance, Langston stopped the car, pulled Webster out of the backseat, beat her, threw her back into the car, and then drove to the house where he was staying. On the way,

Webster begged Petitioner to protect her, and Petitioner said he would try.  (*Id.* at 3.)

After arriving at the house, Langston beat Webster again and forced her to strip and serve the men drinks.  Over a period of six hours, Langston and Carrico repeatedly beat and raped Webster.  During this time, Petitioner also had sex with Webster but claimed it was consensual.  At several points during the ordeal, Webster again pleaded with Petitioner to protect her from the others but he told her he couldn't do anything because he was outnumbered.  Eventually, Langston told Petitioner to kill Webster and threatened him if he did not comply.  Petitioner strangled Webster with a bandana and then stabbed her twice in the chest.  The men wrapped her body in bedsheets and dumped her in a wash.  (*Id.* at 4.) Her body was found the next day.  (RT 11/17/82 at 217-18.)[4]

At trial, Shirley Martin, Petitioner's former girlfriend, testified that Petitioner had told her that he and two friends met a "white girl" at the Green Dolphin bar and then drove to the friends' home, where Petitioner eventually strangled the girl.  (RT 11/18/82 at 328-31.) According to Martin, Petitioner said the girl begged not to be killed.  (*Id.* at 332, 333.) Another witness, Barbara Bailon, who worked with Petitioner between August 1980 and early 1981, testified that she visited him in the spring or summer of 1981 while he was incarcerated in the Pima County Jail on unrelated charges.  During one of these visits, Petitioner told her he had been at a house with two other men and that he had killed "some girl" by strangling her.  (*Id.* at 317-18.)  He told her the other two men "made" him do it.  (*Id.* at 317.)

Dr. Valerie Rao, the medical examiner who autopsied the victim, testified that

---

[4]    At this Court's request, the Arizona Supreme Court provided the original transcripts from Petitioner's trial, sentencing, and resentencing (hereinafter "RT"); the ten-volume consecutively-paginated record on appeal from Petitioner's appeal to the Arizona Supreme Court following resentencing, Case No. CR-97-0334-AP (hereinafter "ROA"); the appellate briefs and other pleadings filed in the Arizona Supreme Court related to Petitioner's appeal and post-conviction proceedings; and Petitioner's and Carrico's presentencing reports. (*See* Dkt. 39.)

Webster was alive and conscious while being strangled. (RT 11/17/82 at 248.) Evidence of severe hemorrhaging of the blood vessels in her eyes and face indicated that Webster put up a "tremendous" struggle. (*Id.* at 248, 255.) Dr. Rao also noted two stab wounds to the chest, one of which punctured Webster's heart. (*Id.* at 253.) This wound was fatal and sustained prior to death. (*Id.* at 254.) In addition, multiple bruises and contusions over Webster's body supported the conclusion that she had been severely beaten and had suffered greatly prior to her death. (*Id.* at 255-62.)

Petitioner did not challenge the fact that he killed Laura Webster. Rather, his defense was insanity. (RT 11/23/82 at 632-40.) Several experts testified at trial. The State called two psychiatric experts, Drs. John LaWall and Edward Gelardin, who had been appointed by the court prior to trial to determine Petitioner's competency. Both testified to their opinions that Petitioner was competent to stand trial and was legally sane at the time of the murder. (RT 11/18/82 at 396; RT 11/19/82 at 466.)

Petitioner called Dr. Sanford Berlin, who testified that he had treated Petitioner for several weeks in 1975 when Petitioner was admitted to a hospital for possible "antisocial adolescent disorder" and paranoid schizophrenia. (RT 11/19/82 at 503.) Dr. Berlin believed that Petitioner suffered from a "thought disorder" and noted that he had been medicated with Thorazine. He described Thorazine as a powerful drug given only to those who suffer from thought disorders. (*Id.* at 506-07.) However, when Petitioner was discharged, Dr. Berlin confirmed that his closing report indicated that schizophrenia was not confirmed and that Petitioner was diagnosed only with "antisocial personality." (*Id.* at 523.) Dr. Berlin could offer no opinion as to whether Petitioner was sane at the time he committed the murder five years later. (*Id.* at 532.)

*Resentencing*

After Petitioner returned to state court for resentencing, Judge Montiel held a presentencing aggravation/mitigation hearing on August 8, 1997. Neither Petitioner nor the

- 9 -

State called any live witnesses at the hearing.[5]  Instead, Petitioner proffered numerous paper exhibits, including the transcript of the two-day habeas evidentiary hearing held in federal court, the federal courts' rulings on his habeas claims, documents relating to his co-defendants' plea agreements, his jail medical records, the transcript of his original capital sentencing proceeding before Judge Roylston, and Judge Roylston's special sentencing verdict.  (ROA at 11-893, 1199-1324, 1398-1421.)

At the federal evidentiary hearing, Drs. LaWall, Gelardin, and Berlin again testified, this time after reviewing new documents compiled during the habeas investigation that provided a fuller picture of Petitioner's medical history.  Based on this additional information, Drs. Gelardin and Berlin opined that Petitioner probably suffered from schizophrenia.  (ROA at 96-100, 145-48.)  They testified that this condition rendered Petitioner susceptible to impulsive behavior and easy manipulation by Langston, whom they characterized as the ringleader in Webster's murder.  (*Id.* at 101-08, 148-49.)  However, neither expert believed Petitioner was legally insane at the time of the offense.  (*Id.* at 110, 153.)

Dr. LaWall did not diagnose schizophrenia but conceded that Petitioner might be schizophrenic and displayed "symptoms" of that illness.  (*Id.* at 32.)  He too believed it was unlikely that Petitioner planned the murder and that Langston, whom he had also interviewed, was capable of murder and of manipulating Petitioner.  (*Id.* at 36-37.)  However, Dr. LaWall reiterated his belief that Petitioner was competent to stand trial and that he was sane at the time of the offense.  (*Id.* at 43.)

Luis Bustamante, the police detective who obtained Petitioner's confession, also testified at the federal habeas evidentiary hearing.  Bustamante stated that Langston was a

---

[5]  Petitioner's resentencing counsel also represented him on direct appeal.  In her opening brief, counsel stated that she did not recall the experts at the presentencing hearing because she "was trying to conserve resources since a record had already been made." (Appellant's Opening Br. at 68 n.25.)

manipulative individual whom he believed had likely killed before. (*Id.* at 180.) He described Langston as a "psychopath" and Petitioner as a "follower" who was used by Langston to advance Langston's fantasies. (*Id.* at 181, 184.) According to Bustamante, Langston was the "major" in planning the murder and Petitioner was the "minor." (*Id.* at 185.) However, Bustamante agreed that Petitioner "went along" with the murder of his own volition. (*Id.*)

At oral argument before Judge Montiel, Petitioner's counsel urged several points of mitigation for consideration at resentencing. Counsel focused chiefly on the experts' diagnosis of Petitioner's mental deficiencies in general and his schizophrenia in particular. (RT 8/8/97 at 27-38, 41-46.) Counsel also cited duress and Petitioner's age as additional statutory mitigators and urged Petitioner's mental problems – and their impact on his tendency toward passiveness, impulsiveness, and easy manipulation by others – as nonstatutory mitigation. (*Id.* at 37-38, 41-42.) Counsel further asserted as mitigating information Petitioner's dysfunctional family life, including his treatment for mental health problems from an early age and the fact that he was raised in a military family that had to move frequently, inhibiting his ability to form lasting relationships. (*Id.*) Counsel also argued that the sentencing disparity with his accomplices was a mitigating circumstance. (*Id.* at 42-43.) These facts were also emphasized in Petitioner's resentencing memoranda. (ROA at 1176-93, 1346-53.)

Judge Montiel stated that he considered the record "in its totality," including the record of the habeas corpus evidentiary hearing, the trial record, the presentence reports, and the other documents proffered by Petitioner. (RT 8/14/97 at 4.) In aggravation, the judge found that the "especially heinous, cruel or depraved" factor had been established beyond a reasonable doubt. *See* A.R.S. § 13-703(F)(6) (1990). With respect to cruelty, the court stated:

> The offense was committed in a cruel manner, because the victim consciously suffered physical and mental pain, the suffering of the victim was beyond the norm experienced by other victims of first-degree murder, and the

defendant knew or should have known the effect his actions would have on that victim.

The victim suffered physical and mental pain because she was beaten, raped, and humiliated by being forced to run naked among three men during a period of approximately six hours.

The autopsy report indicated many bruises and contusions on the body, indicating a great deal of self-defense struggle on the part of the victim and extensive beatings during the course of six hours.

There was further evidence of conscious suffering because a forensic expert testified that Laura Webster was still alive when stabbed by the defendant.

The foregoing evidence of conscious suffering of mental and physical pain also supports a finding that such suffering was beyond the suffering experienced by other victims of first-degree murder.

The evidence also establishes that the [defendant] was aware of the effect of his actions upon the victim because the victim asked for help and protection from the defendant, which pleas were not heeded by the defendant.

The evidence is clear that the victim was conscious for most, if not all, of the six-hour period.

(*Id.* at 5-7.) Although the court found cruelty alone sufficient to establish the (F)(6) aggravator, it also found that the murder had been committed in an especially heinous and depraved manner. (*Id.* at 7.)

With regard to mitigation, the court found that Petitioner's age at the time of the offense (20) was a statutory mitigating factor under A.R.S. § 13-703(G)(5). (*Id.* at 9.) However, it rejected Petitioner's other alleged statutory factors:

[T]he Court finds that, despite the evidence of the defendant's mental illness and use of thorazine for periods prior to and after the murder, the defendant has not met the burden of proving by a preponderance of the evidence that at the time of the murder the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law were significantly impaired, as expressed in A.R.S. 13-703(G)(1). Dr. Gelardin testified that the defendant was not suffering from a psychotic condition or episode at the time of the criminal offense.

That, despite the evidence that Mr. Clabourne killed the victim at the urging of the co-defendant Larry Lynn Langston, the defendant has failed to prove by a preponderance of the evidence that he was under unusual or substantial duress, as expressed in 13-703(G)(2). His sheer size and previous behavior indicates that he could be manipulated but only when he wanted to be manipulated.

(*Id.* at 8-9.)  The court also considered the nonstatutory mitigation urged by Petitioner and found the following proven by a preponderance of the evidence:  that Petitioner has a passive personality, is impulsive, and is easily manipulated by others, and that life imprisonment would be less costly than capital punishment.  (*Id.* at 9-10.)  The court concluded that the proven mitigation was not sufficiently substantial to warrant leniency when weighed against the aggravation and resentenced Petitioner to death.  (*Id.* at 11.)

On appeal, the Arizona Supreme Court conducted an independent review of the sentencing factors.  As to aggravation, the court focused exclusively on the cruelty prong of A.R.S. § 13-703(F)(6):

> [C]ruelty involves pain and distress visited upon the victim.  This distress includes mental anguish. . . . [Here,] [Webster] suffered both mentally and physically.  She was beaten and forced to undress and serve [Clabourne] and his friends drinks.  In addition, she was raped over the course of a six hour period.  She was obviously in great fear [for] her life as she begged [Clabourne] to protect her.  The medical examiner testified that [Webster] had put up a tremendous struggle while being strangled, indicating a good deal of suffering.  This evidence was sufficient to establish cruelty.

*Clabourne II*, 194 Ariz. at 384, 983 P.2d at 753 (quoting *Clabourne I*, 142 Ariz. at 347-48, 690 P.2d at 66-67) (alterations in original).

The court next addressed the statutory mitigation urged by Petitioner, including: (1) whether Petitioner's mental problems significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law under A.R.S. § 13-703(G)(1); (2) whether he was under "unusual or substantial duress" at the time of the murder under § 13-703(G)(2); and (3) his age under § 13-703(G)(5).  *Id.* at 384-87, 983 P.2d at 753-56.

With respect to the diminished capacity mitigator, the court determined that Petitioner had not established that his mental deficiencies rendered him unable to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.  The court noted that, although Drs. Gelardin and Berlin believed Petitioner was schizophrenic, none of the experts could say he was "psychotic" at the time of the killing.  *Id.* at 385, 983

- 13 -

P.2d at 754.  The court found indicative of his ability to appreciate the wrongfulness of his conduct the fact that he tried to conceal the crime by hiding the victim's body and his statement to police that he had wanted to help Webster escape.  *Id.* The court further found that Petitioner had failed to demonstrate any impairment to his ability to control his conduct. *Id.*

With regard to duress, the court determined that Petitioner had not established he was under unusual or substantial duress when he killed Webster.  Although conceding that Langston may have been the mastermind in the murder, the court noted that Petitioner's own confession "shows he was a willing and active participant and was neither induced nor coerced to act contrary to his free will."  *Id.* at 386, 983 P.2d at 755.  The court also noted that Petitioner's age was mitigating but accorded it little weight in light of his "average level of intelligence, [] criminal history and [the fact] he was a major participant in the crime."  *Id.*

Regarding nonstatutory mitigating factors, the Arizona Supreme Court first addressed Petitioner's mental problems, according "some" weight to his schizophrenia and personality traits of being passive, impulsive, and easily manipulated.  *Id.* at 387, 983 P.2d at 756.  However, the court found such mitigation "negligible" when weighed against evidence of Petitioner's "active participation throughout the six-hour ordeal and the fact that he personally strangled and stabbed Webster."  *Id.*  The court also accorded Petitioner's intoxication claim little weight, noting that his "detailed recollection of the events of the evening of Webster's murder, as told to Detective Bustamante more than a year after the murder occurred, belies his claim that he was impaired."  *Id.*  The court declined to find Petitioner's dysfunctional family history as a mitigating factor, noting that he had failed to establish how this background affected his behavior.  *Id.*  Likewise, the court found no mitigating value relevant to his co-defendants' sentences, noting that "only an unexplained disparity . . . may be a mitigating circumstance."  *Id.* at 388, 983 P.2d at 757.  Finally, the court declined to find as mitigation the economic cost of the death penalty because it "is unrelated to Clabourne, his character or record, or the circumstances of his offense." *Id.*

Weighing all the evidence in mitigation against the (F)(6) aggravating factor, the Arizona Supreme Court concluded that the mitigation was "insufficiently substantial to warrant leniency." *Id.*

## DISCUSSION

### Claim 1:        Ineffective Assistance of Counsel

Petitioner contends that counsel was ineffective at his 1997 resentencing for not seeking to suppress his confession, which he alleges was obtained in violation of his Fifth Amendment right to counsel. (Dkt. 27 at 11-15.) He argues that without the confession there was insufficient evidence to establish cruelty under A.R.S. § 13-703(F)(6), the sole aggravating factor relied upon by the Arizona Supreme Court in affirming his death sentence. (*Id.*) Petitioner concedes this claim has not been properly exhausted in state court and blames deficient representation by PCR counsel for the default. (Dkt. 27 at 8-10.)

Ineffective assistance of counsel can establish cause to excuse a procedural default only when it rises to the level of an independent constitutional violation. *Coleman*, 501 U.S. at 755. However, when a petitioner has no constitutional right to counsel, there can be no constitutional violation arising out counsel's ineffectiveness. *Id.* at 752. There is no constitutional right to the effective assistance of counsel in state postconviction proceedings. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989). Thus, a claim of ineffectiveness by PCR counsel cannot establish cause for a procedural default. *See Ortiz*, 149 F.3d at 932 (because there is no right to effective assistance of counsel in a state collateral proceeding, a claim of ineffective assistance of such counsel cannot provide cause for a procedural default).

Petitioner argues that because Arizona requires that claims of ineffective assistance of counsel be raised only in postconviction proceedings and because he has no constitutionally guaranteed right to counsel in such proceedings, there is "no effective state corrective process" and any failure to exhaust this claim in state court should be excused pursuant to 28 U.S.C. § 2254(b)(1)(B)(I). (Dkt. 27 at 13.) Petitioner proffers no legal

authority to support this novel assertion. There is little question that Arizona's PCR scheme provides an effective means of seeking relief for constitutional infirmities. Moreover, the Ninth Circuit has reiterated that there is no constitutional right to counsel in PCR proceedings even if the PCR proceeding is a petitioner's only opportunity to assert claims of ineffective assistance of counsel. *See Ellis v. Armenakis*, 222 F.3d 627, 633 (9th Cir. 2000); *Bonin v. Calderon*, 77 F.3d 1155, 1159 (9th Cir. 1996) (ineffective assistance of counsel claim defaulted for not being raised in first habeas petition, even though same counsel represented petitioner in both proceedings); *Jeffers v. Lewis*, 68 F.3d 299, 300 (9th Cir. 1995) (en banc) (plurality) (ruling an Arizona petitioner had "no Sixth Amendment right to counsel during his state habeas proceedings even if that was the first forum in which he could challenge constitutional effectiveness on the part of trial counsel"). The Court concludes that Petitioner has failed to establish cause for his failure to exhaust Claim 1 in state court.

Alternatively, Petitioner contends that a fundamental miscarriage of justice will occur if Claim 1 is not heard on the merits because he is actually innocent of the death penalty. (Dkt. 36 at 8-9.) To satisfy this exception to procedural default, Petitioner must show by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the existence of any aggravating circumstance or some other condition of eligibility for the death sentence under the applicable state law. *Sawyer*, 505 U.S. at 335-36.

Petitioner argues that his confession was illegally obtained and that it should have been suppressed at resentencing. He further asserts that, because the confession provided the sole basis for the Arizona Supreme Court's cruelty finding, no reasonable factfinder would have found him eligible for the death penalty. Therefore, he is actually innocent of the death penalty and Claim 1 should be addressed on the merits. The Court disagrees.

First and foremost, other evidence supported the cruelty finding. At trial, Shirley Martin testified that Petitioner told her the victim had begged not to be killed. (RT 11/18/82 at 332, 333.) The medical examiner testified that Webster was alive and conscious while being strangled and that she put up a "tremendous" struggle. (RT 11/17/82 at 248, 255.)

Webster also sustained numerous bruises and contusions over her body, likely inflicted prior to death. (*Id.* at 255-62.) Thus, even without Petitioner's confession, there was sufficient evidence from which a trier of fact could conclude that the victim feared for her life and suffered greatly before being killed.

Furthermore, the resentencing court was obligated to consider the confession because it had been properly admitted at trial. When he confessed, Petitioner was incarcerated on unrelated charges and had invoked his right to counsel. *Clabourne*, 64 F.3d at 1378. However, without his counsel's knowledge, Petitioner was interviewed by police and during the interview confessed to murdering Webster. *Id.* Subsequently, in *Arizona v. Roberson*, 486 U.S. 675, 682-85 (1988), the United States Supreme Court held that once a defendant invokes his right to counsel, the right is not offense specific and questioning about a defendant's involvement in any crime outside the presence of his lawyer is prohibited. Nonetheless, the Ninth Circuit held that Petitioner's confession had been properly admitted because *Roberson* did not apply retroactively. *Clabourne*, 64 F.3d at 1379; *see also Butler v. McKellar*, 494 U.S. 407 (1990) (holding that *Roberson* does not apply retroactively). Under Arizona law in effect at the time of Petitioner's resentencing, a sentencing judge was required to consider any evidence admitted at trial that related to aggravating or mitigating circumstances "without reintroducing it at the sentencing proceeding." A.R.S. § 13-703(C) (West Supp. 1997) (amended 2001). Thus, even though Petitioner's confession would not be admissible under present law, at the time of his trial it was properly admitted and therefore the resentencing court was obligated by state law to consider it.

Petitioner has failed to demonstrate that no reasonable factfinder would have found, even without consideration of his confession, the existence of the cruelty prong of the (F)(6) aggravating factor. Therefore, he has failed to show that he is actually innocent of the death penalty and that a fundamental miscarriage of justice will occur if Claim 1 is not decided on the merits. Because he has failed to establish either cause and prejudice or a fundamental miscarriage of justice to excuse his procedural default, Claim 1 is procedurally barred.

**Claim 2:     Failure to Consider Mental Illness as Mitigation**

Petitioner alleges that the state courts unconstitutionally required that he show a "causal connection" between his schizophrenia and the crime before they would consider his schizophrenia as mitigation.[6]  The Court disagrees.

The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and mental problems] may be less culpable than defendants who have no such excuse." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Therefore, a sentencing court is required to consider any mitigating information offered by a defendant, including non-statutory mitigation.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Kansas v. Marsh*, 548 U.S. 163, 175 (2006); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996).  In *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *See also Tennard v. Dretke*, 542 U.S. 274, 283 (2004); *Burger v. Kemp*, 483 U.S. 776, 789 n.7 (1987).  However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence."  *Ortiz*, 149 F.3d at 943; *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be

---

[6]     Respondents contend that this claim was not raised in state court and is now procedurally defaulted.  The Court disagrees.  On appeal, Petitioner alleged that the resentencing court failed to consider all proffered mitigation, including evidence he suffered from schizophrenia.  (Appellant's Opening Br. at 19-37.)  He raised the issue again in a motion for reconsideration from the direct appeal. (Motion for Reconsideration at 4-8, State v. Clabourne, No. CR-97-0334-AP (Ariz. Jul. 6, 1999).)  This was sufficient to exhaust Claim 2.  *See Styers*, 547 F.3d 1026, 1034 (9th Cir. 2008) (assertion in motion for reconsideration "that the court had failed to consider relevant mitigating evidence" sufficient to adequately inform state court of factual and legal basis of challenge under *Eddings v. Oklahoma*, 455 U.S. 104 (1982)).

given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the record to ensure the sentencing court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007) (rejecting a claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant).

Applying these principles, it is apparent in Petitioner's case that the resentencing court fulfilled its constitutional obligation by allowing and considering Petitioner's proffered mental health evidence, both as statutory and nonstatutory mitigation. Arizona Revised Statute § 13-703(G)(1) provides as a statutory mitigating factor that the "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." The plain language of the statute requires the sentencer to consider the defendant's state of mind at the time of the offense. To ensure, however, that proffered evidence insufficient to satisfy the (G)(1) factor is nonetheless considered pursuant to the dictates of *Lockett* and *Eddings*, the Arizona Supreme Court has repeatedly directed that such evidence be considered as nonstatutory mitigation "to determine whether it in some other way suggests that the defendant should be treated with leniency." *State v. McMurtrey*, 136 Ariz. 93, 102, 664, P.2d 637, 646 (1983).

On direct appeal, the Arizona Supreme Court expressly addressed Petitioner's claim that the resentencing judge, after failing to find the existence of the (G)(1) factor, had failed to further consider his mental health evidence as nonstatutory mitigation:

### 1.    Mental Impairment

We reject Clabourne's contention that the resentencing court violated *State v. McMurtrey I,* 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983) or *State v. Gallegos,* 178 Ariz. 1, 17-18, 870 P.2d 1097, 1113-14 (1994), by not explicitly stating that it had considered Clabourne's mental capacity evidence for nonstatutory effect after rejecting the statutory claim. A trial court need not explicitly indicate that mental problems carry no nonstatutory weight; the court must only consider the proffered mitigation for nonstatutory effect. *See id. The resentencing court's finding of the nonstatutory mitigating factor, passive personality/impulsive/easily manipulated, discussed next, demonstrates consideration of Clabourne's mental health evidence.*

### 2.    Passive Personality/Impulsive/Easily Manipulated

We agree with the resentencing court's finding that Clabourne has a passive personality and that he is impulsive and easily manipulated by others. The evidence shows that these traits are rooted to some degree in his mental health problems. *As such, we afford some nonstatutory mitigating weight to Clabourne's mental and personality deficiencies.* However, Clabourne's active participation throughout the six-hour ordeal and the fact that he personally strangled and stabbed Webster renders negligible any mitigating effect Clabourne's problems and the traits they manifest may have.

*Clabourne II*, 194 Ariz. at 387, 983 P.2d at 756 (emphasis added).

Petitioner's contention that the state courts failed to consider evidence of his mental problems as mitigation is baseless. Both the resentencing judge and the state supreme court considered the evidence but concluded that it was not sufficiently weighty to warrant leniency under the circumstances. The sentencer was free to determine the mitigating weight of Petitioner's mental health evidence; its failure to assign such evidence the weight Petitioner believes it warranted does not implicate his federal constitutional rights. *Harris v. Alabama*, 513 U.S. 504, 512 (1995); *Eddings*, 455 U.S. at 114-15. The Arizona Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, controlling Supreme Court law. Therefore, Petitioner is not entitled to relief on Claim 2.

**Claim 3:    Judicial Vindictiveness**

At his original sentencing, Judge Roylston sentenced Petitioner to four 14-year terms

of imprisonment, all to run concurrently, for the kidnapping and sexual assault convictions. *Clabourne I*, 142 Ariz. at 340, 690 P.2d at 59. At his capital resentencing, Judge Montiel reimposed the separate 14-year terms but ordered that they run consecutively. (RT 8/14/97 at 4.) On appeal, the Arizona Supreme Court reversed this aspect of the resentencing court's order and restored the original concurrent sentences. *Clabourne II*, 194 Ariz. at 390, 983 P.2d at 759.

Petitioner now alleges that his capital sentence must be vacated because it was part of the sentencing "package" imposed by the judge.[7] (Dkt. 27 at 25.) The Court disagrees.

Due process requires that a defendant not be subject to vindictiveness at resentencing after successfully attacking his original sentence. *United States v. Peyton*, 353 F.3d 1080, 1085 (9th Cir. 2003). To assure an absence of vindictiveness, if a greater sentence is handed down at resentencing, the judge must affirmatively explain his reasons for doing so. *North Carolina v. Pearce*, 395 U.S. 711, 726 (1969). If the court fails to explain its reasons, a presumption arises that the sentence was imposed for a vindictive purpose. *United States v. Garcia-Guizar*, 234 F.3d 483, 489 (9th Cir. 2000). Such a presumption arises, however, only where there is a "reasonable likelihood" that the increase is a product of actual vindictiveness. *Peyton*, 353 F.3d at 1086 (citing *Garcia-Guizar*, 234 F.3d at 489). The prosecution may rebut this presumption by presenting objective information explaining the increased sentence. *Nulph v. Cook*, 333 F.3d 1052, 1057 (9th Cir. 2003).

---

[7] Respondents assert that Petitioner exhausted a vindictiveness allegation only with regard to Petitioner's noncapital sentences and that any allegation concerning his capital sentence is procedurally defaulted. On appeal, Petitioner argued that Judge Montiel's imposition of consecutive sentences violated his rights under *North Carolina v. Pearce*, 395 U.S. 711 (1969), to be free from retribution for the successful exercise of his right to appeal. (Request to Supplement Opening Brief with One Issue at 1, State v. Clabourne, No. CR-97-0334-AP (Ariz. Jan. 12, 1999).) Any conclusion that the judge behaved in such a manner with respect to the noncapital sentences would necessarily implicate the constitutional validity of the death sentence as well. Therefore, the Court will address this claim on the merits.

In Petitioner's case, the resentencing court did not provide a rationale for sentencing Petitioner to consecutive rather than concurrent terms on the noncapital convictions. Nevertheless, the Court concludes that the facts and posture of this case weigh against a presumption of vindictiveness by the resentencing court. First, the judge at resentencing was different than the judge who imposed the original sentences. *United States v. Atehortva*, 69 F.3d 679, 683 (2nd Cir. 1995) (holding that there is no presumption of vindictiveness if the greater sentence is imposed by a different sentencing judge). In addition, Petitioner himself suggests that confusion rather than animus motivated the court; he concedes that the court did not know which counts were set for resentencing or even what the original sentences were.[8] (Dkt. 27 at 25.) The Arizona Supreme Court also noted that the resentencing court and both parties proceeded under the "erroneous" belief that all the sentences, not just the death sentence, had been set aside. *Clabourne II*, 194 Ariz. at 390, 983 P.2d at 759. The Arizona Supreme Court concluded simply that this was a factual mistake and remand from federal court was for resentencing on the murder conviction only. *Id.* Thus, it appears that error rather than animus explains the court's resentencing of Petitioner on the noncapital counts. Under these circumstances, it is not appropriate to presume vindictiveness. Therefore, absent evidence of actual vindictiveness, the claim fails. *Peyton*, 353 F.3d at 1086; *Garcia-Guizar*, 234 F.3d at 489.

Petitioner has presented no evidence of actual vindictiveness on the part of the resentencing judge in imposing consecutive noncapital sentences. Likewise, any suggestion that the state court vindictively reimposed the death sentence is without merit. The court

---

[8] Petitioner contends that his counsel at resentencing also failed to understand "what counts they were there for resentencing on or what the sentence was the last time" and that this amounted to ineffective assistance. (Dkt. 27 at 25-26.) He further contends that appellate counsel was ineffective for failing to raise this issue on appeal. (*Id.* at 26.) These cursory allegations are unsupported and were not fairly presented in state court. As a result, to the extent Petitioner is now raising these claims on habeas review, they are procedurally barred.

exhaustively explained its basis for reimposing a death sentence. (RT 8/14/97 at 4-11.) Judge Montiel reviewed the evidence at trial and the additional evidence presented at the federal habeas evidentiary hearing and determined that the (F)(6) aggravating factor had been established. (*Id.* at 4-7.) He then concluded that when this factor was weighed against the proffered mitigation evidence, death was an appropriate sentence. (*Id.* at 11.) Nothing in the court's imposition of the death sentence indicates that its decision was based on vindictiveness, bias, or personal animus. Thus, Petitioner has not established that the judge acted vindictively in resentencing him to death.

Finally, in its independent review, the Arizona Supreme Court affirmed the death sentence and corrected the lower court's error in imposing consecutive sentences on the noncapital convictions. *Clabourne II*, 194 Ariz. at 389, 983 P.2d at 758. The supreme court's correction of the lower court's error in resentencing on the noncapital convictions, along with its independent review and reweighing of the aggravating and mitigating factors with regard to the death sentence, insured that Petitioner received due process at resentencing. *Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able to fully consider mitigating evidence and are constitutionally permitted to affirm a death sentence based on independent reweighing despite any error at sentencing).

For all of these reasons, Petitioner has failed to establish that his capital sentence was imposed vindictively in violation of his constitutional rights. He is not entitled to relief on Claim 3.

**Claim 4:    Judicial Conflict of Interest**

Petitioner alleges that Judge Montiel had a conflict of interest that inhibited his ability to fairly preside at Petitioner's resentencing. In support of the claim, Petitioner references a lawsuit filed by a court administrator alleging sexual abuse and harassment that was widely reported in the media. According to Petitioner, these allegations made the judge prone to impose a harsh sentence on him, evincing a form of "compensatory bias" since Petitioner had been convicted of three counts of sexual assault as well as murder. (Dkt. 27 at 26-27.)

Petitioner raised this claim in a motion to vacate judgment following resentencing. (ROA at 1993.) Attached to the motion were several newspaper articles reporting various claims of misconduct against Judge Montiel. (*Id.* at 2001-16.) The articles recount claims of sexual harassment leveled by a court administrator, who was suing Judge Montiel and another judge for wrongful termination. (*Id.*) However, at least one of the articles noted that the EEOC had found the employee's termination to be based on professional concerns and that her claims of sexual harassment had not been substantiated. (*Id.* at 2016.) The plaintiff dropped the suit in February 1997, seven months prior to Petitioner's resentencing. (*Id.* at 2015.)

Petitioner's motion to vacate went before Judge Michael Brown, then the presiding judge of the Pima County Superior Court. (ROA at 2021.) In denying the motion, the judge concluded that

> counsel for the defendant has failed to provide valid factual support for her claim that the sentencing judge "accepted this case and sentenced defendant to death to deflect allegations of a sexual nature that were pending against him." Instead, counsel has attached newspaper articles which repeat claims against Judge Montiel which have been investigated by the EEOC and determined to be unsubstantiated. Counsel both misquotes and misrepresents the news reports and has failed to further investigate the facts responsibly to present the outcome of the charges made against the judge by a former employee.
>
> . . . .
>
> Had counsel conducted a responsible investigation to determine the underlying facts, rather than misrepresenting the allegations reported in the newspaper articles, she would have discovered that these same, unsubstantiated claims of sexual harassment were dismissed in February, 1997, well before the sentencing occurred in this case. These "facts" provide no credible support for Counsel's claim that Judge Montiel imposed the death penalty in this case in order to deflect pending claims against him. Counsel's reliance upon these circumstances for the purpose of this motion is irresponsible and goes dangerously beyond zealous advocacy.
>
> Additionally, counsel impliedly alleges . . . that Judge Montiel was under investigation by the Commission of Judicial Conduct for sexual harassment at the time of the sentencing in this case. Yet a simple investigation would have revealed to Counsel that the Commission's charge against Judge Montiel was based upon his failure to admonish a junior Judge for inappropriate behavior. It is irresponsible for counsel to mischaracterize the record by implying that the Commission on Judicial Conduct was

- 24 -

investigating a charge of sexual harassment against Judge Montiel. Moreover, the article in Exhibit C reports that the "failure to admonish" charge was filed against Judge Montiel on September 19, 1997, fully a month after sentencing in this case had been completed. There is no indication, other than counsel's unverified and unsubstantiated statement, that Judge Montiel was ever charged with sexual harassment. Thus, the allegation that Judge Montiel sentenced the defendant to death in this case in order to "deflect" the allegations pending against him is totally unsupported, even by the hearsay newspaper articles attached to the present motion.

(*Id.* at 2021-22.)

On appeal, the Arizona Supreme Court also rejected this claim, noting that "the record amply supports the presiding judge's conclusion that Clabourne's motion was unsupported by evidence. There is no abuse of discretion." *Clabourne II*, 194 Ariz. at 389, 983 P.2d at 758.

*Analysis*

Petitioner alleges that Judge Montiel was biased and therefore the sentences he rendered were in violation of Petitioner's constitutional rights. A defendant is entitled to a fair trial, free from judicial bias. *In re Murchison*, 349 U.S. 133, 136 (1955). There is a presumption that judges are unbiased, honest, and have integrity. *Schweicker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Similarly, there is a presumption that judicial officials have "properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). On federal habeas review, the Court "must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez,* 67 F.3d 734, 740 (9th Cir. 1995). "To sustain a claim of this kind, there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Id.* (quoting *United States v. DeLuca,* 692 F.2d 1277, 1282 (9th Cir. 1982)).

A petitioner may show judicial bias in one of two ways – by demonstrating the judge's actual bias or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity (i.e., a substantial likelihood of bias). *Paradis*

*v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994); *Fero v. Kerby*, 39 F.3d 1462, 1478-79 (10th Cir. 1994). "Supreme Court precedent reveals only three circumstances in which an appearance of bias – as opposed to evidence of actual bias – necessitates recusal." *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (citing *Withrow v. Larkin*, 421 U.S. at 47). These are (1) when the judge has a direct, substantial pecuniary interest in the outcome of the case; (2) when the judge becomes embroiled in a running, bitter controversy with one of the litigants; and (3) when the judge acts as part of the accusatory process. *Id*. (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971); and *In re Murchison*, 349 U.S. at 137)). In *Johnson v. Mississippi*, 403 U.S. 212, 215-16 (1971), the Supreme Court held that due process of law requires a judge to recuse himself when "it is plain that he was so enmeshed in matters involving the petitioner as to make it appropriate for another judge to sit." The Court has further explained that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy*, 520 U.S. at 904. Thus, "these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar." *Id*.

Petitioner has not presented facts supporting a presumption of bias. He has not alleged or presented evidence that Judge Montiel had a direct, substantial pecuniary interest in sentencing Petitioner. Nor has he alleged or presented evidence that he and Judge Montiel were embroiled in a running, bitter controversy, or that the judge was effectively part of the accusatory process. Therefore, the Court will not presume bias.

There is also no support in the record for a claim of actual bias. Petitioner merely speculates that a wrongful termination lawsuit by a court employee against Judge Montiel raising claims of sexual abuse or harassment rendered the judge incapable of passing a fair and unbiased sentence in Petitioner's case. This speculative assertion, without more, cannot support a finding of actual bias. As noted by Judge Brown, the lawsuit against Judge Montiel was resolved in February 1997 when the plaintiff withdrew the suit, seven months before

Petitioner's resentencing. (ROA at 2015.) In addition, the EEOC issued a statement which effectively exonerated Judge Montiel of any wrongful behavior in the employee's termination, including any claims of sexual abuse or harassment. Judge Brown's finding that the harassment allegations were baseless is entitled to deference and is supported by the record. Petitioner has failed to rebut the finding with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The state court's rejection of this claim was based on neither an unreasonable application of relevant Supreme Court law nor an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas relief on Claim 4.

**Claim 5:        Cruelty Aggravating Factor**

Petitioner contends that the cruelty prong of A.R.S. § 13-703(F)(6) does not sufficiently narrow the class of persons eligible for the death penalty. Respondents assert that Petitioner did not raise this claim in state court, that it is now technically exhausted, and that it should be denied on the basis of procedural default. Petitioner concedes the claim was not raised in state court but argues this failure should be excused because Arizona courts have repeatedly rejected this claim and therefore it would have been futile to present it in state court. (Dkt. 27 at 32.)

Petitioner's futility argument is insufficient to excuse his failure to exhaust a claim in state court. *Roberts v. Arave*, 847 F.2d 528, 530 (9th Cir. 1988) ("the apparent futility of presenting claims to state courts does not constitute cause for procedural default") (citing *Engle v. Isaac*, 456 U.S. 107, 130 (1982)). Petitioner presents no other basis for failing to exhaust this claim in state court. Nor has he alleged that a fundamental miscarriage of justice will occur if this claim is not addressed on the merits. Consequently, Claim 5 is procedurally barred.

**Claim 6:        Victim Impact Statements**

Petitioner contends that his constitutional rights were violated because, prior to resentencing, victim impact letters "poured in unchecked presenting the writers' opinions

about the crime, about the defendant, and about the appropriate sentence." (Dkt. 27 at 33.) Petitioner has not proffered copies of the letters nor were they included in the state court record provided to this Court. Nonetheless, Respondents do not contest the accuracy of the excerpts cited by Petitioner in his habeas petition. (*See* Dkt. 33 at 44-47.)

On appeal, the Arizona Supreme Court rejected Petitioner's claim that the submission of letters advocating capital punishment violated his constitutional rights and tainted his resentencing. *Clabourne II*, 194 Ariz. at 390, 983 P.2d at 759. The court noted that "there is no indication that the resentencing court considered the victim impact statements when determining whether to impose the death penalty. Therefore, there was no error." *Id.*

*Analysis*

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a victim impact statement during the sentencing phase of a capital case violated the Eighth Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827 n.2 (1991), the Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect a per se barrier to admission of victim impact evidence, but left intact *Booth's* prohibition on the admissibility of opinions from the victim's family about the crime, the defendant, or the appropriate sentence.

Under Arizona law at the time of Petitioner's trial, the judge, not the jury, determined the penalty in a capital case. A.R.S. § 13-703 (West Supp. 1997). As the Arizona Supreme Court has explained, judges are presumed to know and follow the law and are capable of setting aside any irrelevant, inflammatory, or emotional factors in selecting the appropriate sentence. *State v. Mann*, 188 Ariz. 220, 228, 934 P.2d 784, 792 (1997); *see also Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir. 1994). Therefore, "in the absence of evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997).

Although the letters submitted by friends of family of the victim impermissibly

- 28 -

request that Petitioner be sentenced to death, Petitioner has pointed to nothing in the record to indicate the resentencing court relied on these letters in passing sentence. In fact, as already recounted in detail, the resentencing court's special verdict imposing the death penalty was predicated solely on its weighing of the (F)(6) aggravating factor against the mitigating circumstances offered by Petitioner. (RT 8/14/97 at 5-11.)

Likewise, the Arizona Supreme Court, in its independent review affirming the death sentence, focused exclusively on the evidence supporting the aggravating factor of cruelty and the mitigating factors presented by Petitioner. *Clabourne II*, 194 Ariz. at 384-88, 983 P.2d at 753-57. In the absence of any clear indication that the state courts improperly considered the letters in passing sentence, this Court assumes that the state courts followed the law. *Gretzler*, 112 F.3d at 1009. For this reason, the Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of relevant Supreme Court law. Petitioner is not entitled to relief on Claim 6.

**Claim 7:    Ineffective Assistance of Counsel**

Petitioner appears to assert that resentencing counsel was ineffective for failing to have Petitioner re-evaluated by a mental health expert prior to resentencing. (Dkt. 27 at 37; Dkt. 36 at 24.) Petitioner concedes this claim has not been properly exhausted in state court and blames deficient representation by PCR counsel for the default. (Dkt. 36 at 24.) To this end, he asserts that direct appeal counsel (who also served as resentencing counsel) was concerned that she may have erred in not having experts provide live testimony at the resentencing hearing and that she relayed this concern to PCR counsel, who allegedly agreed to raise an ineffective assistance claim on this ground. (*Id.* at 24 & n.5.) However, PCR counsel "never asked for money to hire any psychological experts" and never presented the claim in the PCR petition. (*Id.* at 24.)

As already noted with regard to Claim 1, there is no right to the effective assistance of counsel in a postconviction proceeding, even if that is the first opportunity to assert an ineffective assistance claim. *Ellis v. Armenakis*, 222 F.3d at 633. Therefore, PCR counsel's

alleged ineffectiveness cannot establish cause for the default, *Ortiz*, 149 F.3d at 932, and Claim 7 is procedurally barred.

**Claim 8:     Sentencing Disparity**

Petitioner's co-defendants, Larry Langston and Edward Carrico, received lesser sentences for their roles in the murder of Laura Webster. Langston, pursuant to a plea agreement, pleaded guilty to first degree murder and received a life sentence with a possibility of parole after 25 years; Carrico pleaded guilty to hindering prosecution, a Class Five felony, and was sentenced to a term of probation. Petitioner contends that the trial court erred in failing to accord mitigating weight to the disparity between his death sentence and the lesser sentences of his co-defendants. (Dkt. 27 at 38.)

As already discussed with respect to Claim 2, the sentencer in a capital case may not refuse to consider, as a matter of law, any relevant mitigating evidence. *Eddings*, 455 U.S. at 113-14; *Lockett*, 438 U.S. at 604. However, provided the sentencing court has not refused to consider relevant evidence, it is not required to find the proffered evidence mitigating or to accord it the weight a defendant believes is appropriate. *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994); *Eddings*, 455 U.S. at 114-15.

In this case, review of the record reveals that the state courts considered sentencing disparity as potential mitigation but declined to accord it mitigating weight. In its special verdict, the resentencing court noted that the disparity between the sentences "was based upon Carrico's agreement to give evidence against Langston and upon Langston's agreement to plead guilty in exchange for a life sentence." (RT 8/14/97 at 10.) As a result, Petitioner failed to show that "the disproportionality of the co-defendants' sentences was baseless or irrational, and the Court cannot consider the disproportionate outcomes as a mitigating circumstance in this case." (*Id.*) Likewise, the Arizona Supreme Court noted that under Arizona law "only an unexplained disparity between sentences may be a mitigating circumstance." *Clabourne II*, 194 Ariz. at 388, 983 P.2d at 757 (citing *State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993)). The court concluded that the disparity was justified

because "Carrico was not charged with murder and Langston pled guilty. Moreover, Clabourne was the killer, and the State was of the view that a plea agreement with Langston was necessary because 'the case against Langston was, at best, shaky, while the case against [Clabourne] was overwhelming, with much of the evidence coming from his own mouth.'" *Id.* (internal citation omitted; alteration in original).

Petitioner's principal argument is not that the state courts failed to consider his proffered mitigation, but that they failed to accord it the weight he believes it deserved. However, there is a distinction between "a failure to consider relevant evidence and a conclusion that such evidence was not mitigating"; the latter determination does not implicate a defendant's federal constitutional rights. *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006). Thus, the fact that the court found the evidence "inadequate to justify leniency . . . did not violate the constitution." *Ortiz*, 149 F.3d at 943; *Eddings*, 455 at 114-15. Petitioner is not entitled to relief on Claim 8.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. Therefore, the Amended Petition for Writ of Habeas Corpus will be denied and judgment entered accordingly.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that otherwise might be consumed drafting an application for a certificate of appealability to this Court, the Court on its own initiative has evaluated the claims within the Amended Petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not

issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 2. The Court therefore grants a certificate of appealability as to this claim. For the reasons stated in this Order, the Court declines to issue a certificate of appealability for Petitioner's remaining claims and procedural issues.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 25) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by the Court on November 3, 2003 (Dkt. 3) is **VACATED.**

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

> Whether Claim 2, alleging that the state courts failed to consider evidence of schizophrenia as mitigation, fails on the merits.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 29th day of September, 2009.

Raner C. Collins
United States District Judge